Edwin A. Taylor, Appellee, v. The Atchison, Topeka and Santa Fe Railway Company, Appellant.

Gen. No. 39,525.

Opinion filed December 6, 1937. Rehearing denied December 20, 1937.

EMMET TRAINOR, of Chicago, JOSEPH S. LAFFERTY and JOYCE COX, for appellant; CHARLES H. WOODS, of Chicago, of counsel.

ROBT. J. McDONALD and WILLIAM H. DE PARCQ, both of Minneapolis, for appellee; SAMUEL COHEN and JOHN E. BURKE, both of Chicago, and LEO W. HODEL, of Joliet, of counsel.

MR. JUSTICE McSURELY delivered the opinion of the court.

September 7, 1934, plaintiff, while employed as a fireman on one of defendant's locomotives, was injured in a collision with another locomotive heading a train in the State of Kansas; he brought suit under the Federal Employers' Liability Act in the superior court of Cook county, Illinois, and upon trial had a verdict for $75,000; remittitur of $16,200 was made and judgment

was entered against defendant for $58,800, from which it appeals.

A preliminary question relates to the venue and the effect of an injunctional order restraining plaintiff from prosecuting this suit in this county.

The suit was commenced here October 4, 1935, and October 30 on defendant's application to the district court of Neosho county, Kansas, an *ex parte* order was entered enjoining plaintiff from prosecuting this action in Cook county, Illinois, until the further order of the Kansas court. This injunctional order was set forth by a plea in abatement filed in the instant suit, but upon motion of plaintiff was stricken by the trial court. Defendant argues that this action was reversible error, relying principally upon *Allen v. Chicago Great Western R. Co.*, 239 Ill. App. 38. Most of the other cases cited by defendant involve the question of the equity power of a court and the propriety of its exercise under certain circumstances.

The *Allen* case was not an action under the Employers' Liability Act and Allen relied upon the principle of comity between the States to justify her action in suing in Illinois. Adeline Allen resided in Waterloo, Iowa, and on December 23, 1921, brought suit in the district court of the county where she resided for $2,900 as damages for personal injuries received at Waterloo, caused by the defendant's train striking her; while this was pending, and over a year later, another lawyer filed suit in Cook county, Illinois, on the same cause of action to recover $40,000; the Iowa court issued a writ of injunction restraining the prosecution of the Illinois suit; our Appellate Court held that the filing of the Illinois suit on the identical cause of action while the first one was pending in Iowa constituted unwarranted and vexatious litigation, and as there was no sufficient reason in comity to ignore the judicial command of the sister State the plaintiff was relegated to her remedy in the Iowa court; and our

opinion noted that the injunction was issued by the court of the State in which plaintiff resided, where she already had a suit pending, where the accident happened and where the witnesses lived. In the instant case defendant operates a line of railroad in Cook county, Illinois, owns property, maintains offices and keeps regular employees and a staff of lawyers here; the suit was brought under the Federal Act and prior to the Kansas injunction.

As a general proposition the court first obtaining jurisdiction of a case may hold jurisdiction to the exclusion of other courts having concurrent jurisdiction. *Juhlin v. Hutchings,* 90 Kan. 618; *Wise v. Pacific States Life Ins. Co.,* 11 F. Supp. 895; *The Salvore,* 36 F. (2d) 712. Defendant cites *Illinois Life Ins. Co. v. Prentiss,* 277 Ill. 383, and *Royal League v. Kavanagh,* 233 Ill. 175, but these merely hold that an injunction restraining the prosecution of a suit in another jurisdiction should not issue unless it clearly appears that bringing the suit in a foreign State would result in fraud, gross wrong or oppression.

The Federal Employers' Liability Act (USCA—title 45, sec. 56) clearly makes it the duty of the Illinois court to try the case on its merits. It provides, among other things, that a suit thereunder may be brought in a district court of the United States where the defendant resides, or in which the cause of action arose, or in which the defendant is doing business when suit is commenced. The jurisdiction of the United States courts is concurrent with that of the State courts. In *Taylor v. Southern Ry. Co.,* 350 Ill. 139, it was said that a plaintiff to whom a right of action is given by the act has a right to bring his suit in either the Federal or State court, and that if he elects to bring suit in a State court it is the duty of that court, when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion, to take cognizance of an action to enforce a right of recovery, arising

under the act, citing *Minneapolis & St. Louis R. Co. v. Bombolis,* 241 U. S. 211, and *Louisville & N. R. Co. v. Stewart,* 241 id. 261.

The opinion in *Mondou v. New York, N. H. & H. R. Co.,* 223 U. S. 1, upheld the constitutionality of the Employers' Liability Act, and said: "We conclude that rights arising under the act in question may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local laws, is adequate to the occasion." In *Schendel v. McGee,* 300 Fed. 273, the act was construed to give the employee the right to maintain an action for damages in the courts of the district where the defendant is doing business at the time suit is commenced, and said: "It being the law, it is a court's duty, where there is jurisdiction, to take and retain that jurisdiction and try the case." In *Hoffman v. Missouri ex rel. Foraker,* 274 U. S. 21, the suit was brought in Missouri under the Federal act to recover for the death of an employee of the Missouri Pacific Railroad through an accident occurring on its line in Kansas; the railroad is a Missouri corporation and the suit was brought in that State in a county traversed by the railroad and in which it had an office and an agent; the trial court supported defendant's contention that it should have been sued in Kansas where the accident occurred and the plaintiff resided; the Missouri Supreme Court held against the trial court and the railroad company appealed to the United States Supreme Court. It was there held that as defendant was sued in a county in which it had an agent and operated its railroad, plaintiff could maintain his action in Missouri. In Roberts' Federal Liabilities of Carriers (2nd ed.) vol. 2, p. 1842, the author says in substance that the provision of the act relating to the venue "is one for the benefit of the plaintiff, and it permits him to institute the action in whichever of the . . . designated places best serves his convenience." One of these places is where the

railroad operates. Plaintiff in the instant case alleges that defendant was operating a railway line extending into Cook county, Illinois.

The facts in *Alford v. Wabash Ry. Co.* (Mo.), 73 S. W. (2d) 277, are somewhat like those at bar. There the plaintiff, a resident of Illinois, where the accident happened, sued under the act in a circuit court in Missouri; the defendant railroad company was an Indiana corporation doing business in Missouri; it secured an injunction from the circuit court of Morgan county, Illinois, against the further prosecution of the Missouri action and sought to have it abated. It was held that the right of the Missouri court to proceed attached before the injunction and that there was no rule that would require that court to discontinue the proceedings. Other cases to the same effect are *Kepner v. Cleveland C., C. & St. L. Ry. Co.* (Mo.), 15 S. W. (2d) 825; *Frye v. Chicago, R. I. & P. Ry. Co.*, 157 Minn. 52; and *Peterson v. Chicago, B. & Q. R. Co.*, 187 Minn. 228.

We hold in the instant suit brought under the Federal Employers' Liability Act, under proper allegations giving the local court jurisdiction, and commenced prior to the injunctional order from the Kansas court, that such order is of no avail as restraining the local court from proceeding to try the cause upon its merits.

In the early morning of the day of the accident plaintiff as fireman, with engineer Hanson, was backing engine No. 1814 eastward from Burden, Kansas, over defendant's single track, when it collided on a curve with No. 13, a westbound passenger train; the engineer and fireman of No. 13 and Hanson were killed; plaintiff was the sole survivor of the engine crews.

Plaintiff alleged that the servants in charge of both engines so negligently operated them as to cause the collision, and that engineer Hanson on the eastbound

engine negligently failed to take a sidetrack five minutes in advance of the superior (having the right of way) passenger train No. 13.

Moline, Kansas, is about 28 miles east of Burden and at this place Hanson and plaintiff received orders to connect their engine No. 1814 onto the head end of a freight train going west. There is an elevation between these points, and plaintiff's engine was to act as a helper for the westbound freight train over the grade. While on the way plaintiff was busy firing and paid no attention to the time or speed. He says he was too busy with his general line of work. Their orders were that when they arrived at Burden they were to uncouple the engine and return to Moline.

When the freight train stopped at Burden engine 1814 was cut off, switched over to a passing track and the train proceeded onward to the west; the rear light of the engine was lighted, it backed out and plaintiff boarded it and commenced firing. The engine was going eastward returning to Moline. Hanson, the engineer, inquired of plaintiff as to where they should meet westbound 13; this inquiry was apparently caused by the fact that, in violation of the rules, Hanson did not have his official time card with him; plaintiff got out his own and attempted to look at it but was "fire blind" and could not see the figures clearly. It is in evidence that after firing the light from the fire causes a fireman to become temporarily blinded. Plaintiff handed his time card to Hanson who noted that 13 was due at Grand Summit at 4:05 a. m., and after looking at his watch remarked that it was 3 o'clock, giving them one hour to reach Grand Summit, a distance of 13 miles to the east; Hanson decided that they should take the siding at Grand Summit.

The only station between Burden and Grand Summit was Cambridge where there was a siding; when passing Cambridge plaintiff inquired of Hanson as to

the time and after looking at his watch Hanson said it was 3:32; plaintiff then took out his own watch, which showed that the time was 4:06; plaintiff says he had not looked at his watch before this as he was busy with his duties and had put on a lumber jacket, buttoning the collar into his shirt so that it was hard for him to get at his watch. There is no rule of the defendant road requiring the fireman personally to look at his watch at regular intervals, although the engineer and fireman are required to compare time with each other.

Plaintiff on discovering this discrepancy between the watches suggested that they stop at Cambridge to ascertain which watch was right, to which Hanson said that his own watch was right and plaintiff's watch was wrong, as it had been hit by a shovel during the night. Plaintiff testified he had jerked out his watch as they were going westward and had hit the shovel handle pretty hard; that based on this, Hanson persuaded plaintiff that his watch was wrong; as plaintiff expressed it, "He (Hanson) talked me out of my own watch." The engine proceeded on toward Grand Summit, Hanson sitting on the seat box and plaintiff firing; going east it is upgrade from Cambridge to Grand Summit; plaintiff was down on the deck shoveling coal, Hanson was watching plaintiff work, and they were talking about the difference in time of their watches at the very moment of the collision with westbound 13; this happened about three miles east of Cambridge.

Defendant's rules introduced in evidence prescribe that when there is no conductor the engineer is in full charge and responsible for the safety of the train; he must direct the fireman in the performance of duty and the latter is under the direction of the engineer. One of defendant's witnesses testified that a fireman violates this rule if he refuses to follow the engineer's orders.

The collision occurred on a curve with which Hanson was familiar; the vision was clear either way for from 2,000 to 2,500 feet; the backup headlight on engine 1814 cast a ray of light 1,000 to 1,500 feet; on dark nights headlights such as those on the two engines involved can be seen on a straight track two or three miles away.

The rules require engineers to look ahead and watch the track, and this is required even of an engineer of a superior train with the right of way. The duty to do this would be especially urgent upon rounding a curve, and yet the evidence shows that neither engineer reduced speed before the moment of the crash. Westbound 13 was traveling 33 to 35 miles an hour at the moment of the collision; the brakes were applied only a fraction of a second before the crash; the eastbound engine was traveling 18 miles an hour and the brakes were not applied at all. The rules also require engineers to sound a whistle going around curves. Hanson sounded no whistle and the only whistle from the other engine occurred about but a quarter of a mile east of the point of collision.

Another rule requires that an extra train, like engine 1814, must clear the track of opposing regular trains by not less than five minutes. Defendant's trainmaster testified that under the rules it was Hanson's duty to get off the main line five minutes before 13 was due to leave the station where the siding was.

Defendant argues that the trial court should have stricken the count of plaintiff's declaration alleging that the servants in charge of both engines negligently operated them. The argument seems to be based upon the premise that the engineer of westbound 13 was under no duty to exercise any care to avoid injuring plaintiff; that his status as a fireman is like that of a trespasser who is at fault in failing to get off the track. This is not the law. The fireman is merely an

assistant acting under the direction of the engineer, and from the character of his duties in keeping up steam by firing, it cannot be said that it is his paramount duty to be on the lookout all the time. As was said in *St. Louis & S. F. R. Co. v. Bishard,* 147 Fed. 496, "Other duties of moment may have demanded his attention elsewhere." *Kierce v. Central Vermont Ry., Inc.,* 79 F. (2d) 198, held generally that rules for the protection of passengers on a train are also for the protection of the crews of the train. In *Chicago, R. I. & P. Ry. Co. v. Wright,* 239 U. S. 548, a rule provided that extra trains must protect themselves within the yards; the railroad company argued that this relieved other engineers from taking requisite precautions for avoiding a collision; that the engineer having the right of way could not be guilty of negligence with reference to the inferior engine. The Supreme Court did not agree with this but held that the question of the negligence of either or both of the engineers was one of fact for the jury to decide.

The questions of contributory negligence and assumption of risk were properly submitted to the jury. Defendant cites on the proposition of assumed risk the old case of *Baltimore & O. R. Co. v. Baugh,* 149 U. S. 368. This was long before the Federal Employers' Liability Act, and was decided upon the rule that as the negligence of the engineer (the fellow servant of the injured fireman) caused the accident, hence under the fellow servant doctrine the fireman could not recover. This doctrine has since been abolished. 45 U. S. C. A. 51, cases under Note 312; Roberts Federal Liabilities of Carriers (2d Ed.), vol. 2, p. 1538; *Devine v. Chicago, R. I. & P. Ry. Co.,* 266 Ill. 248.

Defendant seems to say that plaintiff should have actually known that Hanson's watch did not correctly show the time. When plaintiff wished to take the siding at Cambridge, Hanson recalled to plaintiff that

his watch had been damaged, and as plaintiff knew this to be a fact he was convinced that Hanson was right. The alternative to accepting Hanson's statement would have been for plaintiff either to have overpowered Hanson and stopped the engine or to have jumped off. *Wilson v. Chicago, B. & Q. R. Co.,* 317 Mo. 647, involved a situation much like that in the instant case. There an inferior train, in violation of orders left a siding prematurely, colliding head-on with a passenger train; it was argued, as in the present case, that the same duty was imposed upon the fireman as upon the engineer to prevent the train from leaving the siding. The court at p. 669 said: "Under such circumstances, there were but two courses of action left open to the deceased fireman; either he must have wrested control of the engine from his superior, Engineer Barclay, by main force and violence or he must have deserted his post of duty in firing the engine and jumped from the engine. In our judgment, deceased was not called upon to take either such action in order to absolve himself from the charge of negligence on his part." Other cases like that at bar are *Hawthorne v. International-Great Northern R. Co.* (Tex. Civ. App.), 63 S. W. (2d) 243, and *St. Louis & S. F. R. Co. v. Bishard, supra.* The court properly submitted to the jury the questions of negligence of both engineers, plaintiff's assumption of risk and contributory negligence.

It was not reversible error to refuse defendant's requested instruction 8, which in substance was that if plaintiff participated with engineer Hanson in violating the rule requiring the extra engine to be on the sidetrack five minutes before number 13 was due at that point, the verdict must be not guilty. This rule is necessarily directed to those having in charge the management and control of a train or engine and not to a subordinate employee; the instruction was not

predicated upon any evidence that plaintiff partici-
pated with Hanson in violating the rule; he endeavored
to persuade Hanson to take the safe siding. Other
instructions given, especially defendant's instructions
3, 25 and 26 virtually cover the same proposition as
in the refused instruction. Moreover, it was incon-
sistent with defendant's given instruction 27 and the
interrogatory submitted by it which were to the effect
that if the plaintiff was guilty of contributory negli-
gence the damages should be diminished by the jury
in proportion to the amount of negligence attributable
to the employee. This is the provision in the Federal
Act itself. It should be borne in mind that defendant's
rule 458 prohibits a fireman from operating an engine
except with the consent of the engineer.

Defendant says the size of the verdict indicates that
it was produced by passion and prejudice. After the
collision plaintiff was found 15 feet from the track,
with his head down between his knees; he was uncon-
scious seven days and when he regained consciousness
suffered intense pain; he was afflicted with motor
paralysis, including his bowels and bladder; blood and
water discharged from his ear; he was taken to various
hospitals and a large number of X-rays were taken;
he received various treatments while in the hospitals,
including a puncture of the spine; the following May
he was still in the hospital and a belt was prescribed
for his back; he later received treatments from doctors
at his home and was examined by doctors in Minne-
apolis in August, where he was advised to wear a
neck brace to support his head; he has worn this ever
since except when in bed and when his wife shaves
him; without it his head falls over to the left; he can-
not dress or undress himself and his condition is
gradually growing worse. We have only briefly out-
lined the story of his injuries. Defendant's witnesses
testified tending to corroborate plaintiff's testimony

as to his condition, but almost the entire story of plaintiff's experience in hospitals and treatment by doctors was given by plaintiff himself. In January, 1936, he came to Chicago at the request of defendant and was examined by two of defendant's physicians. Altogether between 24 and 36 X-ray pictures were taken of him, but at the trial none of these was introduced in evidence and there was no testimony whatever tending to contradict that of plaintiff as to his sufferings and physical condition. In fact he was not cross-examined on these subjects and no one gave any evidence tending to dispute plaintiff's story in this regard. The parties stipulated upon the trial that plaintiff ''was totally and permanently disabled from performing heavy manual labor such as is involved in the work of a railroad engineer or fireman.''

At the time of the trial plaintiff was 49 years old and held seniority rights as an engineer and fireman; his life expectancy was 21.63 years. Upon the hearing of defendant's motion for a new trial the court found that plaintiff's actual salary loss to the time of the trial was approximately $3,800; that based on the present cash value of future damages, if plaintiff worked continuously during the years of expectancy, he would as fireman receive something over $30,000, and as engineer over $40,000; the court held that it would be fair to estimate this element of damage at $35,000, and added the loss of wages up to the time of the trial, $3,800, making a total of $38,800. In addition to this amount the court said plaintiff was entitled to recover damages for pain, suffering and disability, and held that an additional amount of $20,000 would be just compensation for this and ordered a remittitur reducing the verdict to $58,800.

In most of the cases cited by defendant on the question of the amount of damages the injuries themselves were sharply disputed. In the instant case this is not

true. Defendant introduced no evidence controverting the extent of plaintiff's injuries, but stipulated that he was totally and permanently disabled from performing heavy manual labor. Under these circumstances we cannot say that the verdict as reduced is clearly excessive.

Upon the motion for new trial defendant's counsel presented affidavits purporting to show newly discovered evidence. Persons who had observed plaintiff in the spring of 1936 said they had observed him at times when he was not wearing the neck brace, and had also observed him walking; photographs were presented supporting these statements. Plaintiff had testified that at times he could walk alone but not any distance, and certain of defendant's witnesses testified that they had seen him walk for some distance on certain occasions. The newly discovered evidence did not contradict the evidence in the record as to plaintiff's physical condition. Moreover, defendant's doctors had examined him in Chicago only a few months before the trial, and if they had discovered anything tending to show a different state of facts than those claimed for him they would have so testified. The fact that they did not tends to corroborate plaintiff's evidence.

In *People v. Dabney,* 315 Ill. 320, the characteristics of newly discovered evidence which will require a reversal are given. Among these are that it must appear to be of such conclusive character that it will probably change the result if a new trial is granted. Also, it must be such as could not have been discovered before the trial by the exercise of due diligence, and must not be merely cumulative to the evidence offered on the trial. The newly discovered evidence in the instant case failed to meet these requirements and the court properly denied the motion for a new trial.

The limitations of time and space do not permit us to comment on all the cases cited by respective counsel. They are many and show great diligence on the part

of attorneys for both parties. We have contented our-selves with the affirmative reasons for our conclusion.

We hold that the superior court of Cook county had jurisdiction to try the cause, that the verdict is not against the manifest weight of the evidence, that no reversible errors occurred upon the trial, and that the verdict, as reduced by order of the court, is not ex-cessive. The judgment is therefore affirmed.

*Affirmed.*

O'CONNOR, P. J., and MATCHETT, J., concur.