Frank JENKINS (Plaintiff), Appellant,

v.

TERMINAL RAILROAD ASSOCIATION OF
ST. LOUIS, a Corporation (Defendant),
Respondent.

No. 29014.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1955.

Joseph D. Feigenbaum and Ellsworth W. Ginsberg, St. Louis, for appellant.

Warner Fuller and Arnot L. Sheppard, St. Louis, for respondent.

MATTHES, Judge.

This is an appeal by plaintiff-appellant from the order of the trial court sustaining defendant-respondent's motion for a new trial after plaintiff had obtained a verdict and judgment in the amount of $4,500 for personal injuries. The motion for new trial was sustained on the ground that "the verdict is so excessive as to indicate it resulted from passion and prejudice on the part of the jury against defendant".

In addition to defending the action of the court in granting a new trial for the assigned reason, defendant urges that plaintiff failed to make a submissible case, and that the court should have sustained its motion for a directed verdict. Determination of this question is basic, and we will examine the record to ascertain and decide whether plaintiff made a jury case. Obviously, if the instant record demonstrates that plaintiff, under the law and evidence, cannot recover, the parties should be spared the trouble and expense of another trial. In reaching a conclusion upon this basic question we shall consider the evidence from the standpoint most favorable to plaintiff.

On August 8, 1952, plaintiff was an employee of defendant. He was a laborer doing "track work", and engaged in removing old cross ties and replacing them with new ties. There were eighteen or twenty men in the extra gang of which he was a member. In order to remove the ties it was necessary to pull the spikes which secured the rails to the ties. A claw bar approximately five feet in length was the tool used for that purpose. Plaintiff stated that there were about fifteen such bars kept in the tool shed; that prior to August 8, 1952, all of the bars were worn and chipped out between the prongs forming that part of the bar which was inserted under the head of a spike, and that the bars were spread open from use. At approximately 3:30 p. m. on August 8th, Charlie Brown, the assistant foreman of the gang, instructed plaintiff to get a claw bar and pull a spike from a cross tie that was to be removed. Pursuant to that instruction plaintiff selected the best of three bars which were, in his words, "laying down". All three of the bars were defective. With the bar thus selected, plaintiff undertook to pull the spike, and in doing so he placed the opening of the claw end of the bar under the head of the spike with one prong on either side thereof. As he applied pressure to the handle of the bar in an effort to pull the spike, the claw end of the bar slipped off the spike suddenly, and plaintiff's right hand which was holding the opposite end of the bar came in contact with one of the steel rails, causing an injury to his hand at the base of the thumb. When asked to describe the occurrence and the manner in which the bar slipped off the spike, plaintiff stated: "By the sprongs [sic] being too large, in here, it wouldn't hold that spike edge and when I pulled down it come right on off"; and with reference to the condition of the claw bar, he said it was, "Worn, where it wouldn't take ahold of the spike. So large it wouldn't hold a spike head. The spike had a head on it. This claw bar, being worn, it was too large, it wouldn't hold, it come right off, like that."

John Jones, who had worked for the defendant as a track laborer fourteen or fifteen years, but had been discharged by the defendant prior to the date of the trial, corroborated plaintiff on the question of the condition of the claw bars furnished by the defendant. Jones said there were fifteen or eighteen bars in the tool car in the summer of 1952; that prior to August 8th the prongs forming the claws on all of the bars had widened, which was brought about by striking the back of the bars with sledge hammers in driving or fastening the claw around the spike; that

many times the bars had slipped off the spikes as Jones was attempting to remove the spikes from the ties.

Bearing on knowledge by defendant of the condition of the bars, plaintiff testified that about a week before August 8th he complained to Charlie Brown and told him "the claw bars were bad"; that "the claw bars were bad and need working on"; and Jones testified that two or three weeks prior to August 8, 1952, he informed Dominick Accetta, foreman of the crew, of the defective condition of the claw bars.

Immediately following the incident plaintiff suffered pain in his right hand, it was "stinging". He told Brown who was standing nearby his "hand was hurting, broke". Plaintiff continued working until 4 o'clock, which was the usual quitting time. On the following day, Saturday, plaintiff was taken to the Missouri Pacific Hospital. The surgeon's injury report, constituting a portion of the hospital record, disclosed that Frank Jenkins, thirty-nine years old, was the injured person, and that the accident occurred on August 8, 1952.

■■ To support the point that a jury case was not made, defendant contends that plaintiff failed to establish by substantial, probative evidence, the pleaded negligence, which in essence was that defendant breached the duty imposed upon it by law to exercise ordinary care to furnish plaintiff with reasonably safe tools with which to work. We agree, as contended by defendant, that if there were claw bars available to plaintiff on August 8th, free of defects and safe for their intended use, but that plaintiff selected one that was defective, and that the use of the defective bar resulted in plaintiff's injury, defendant would not be liable. Probst v. Heisinger Motor Co., Mo.App., 16 S.W.2d 1005; Forbes v. Dunnavant, 198 Mo. 193, 95 S.W. 934; Labatt's Master and Servant (2d Ed.), Vol. 4, p. 4573, Sec. 1533. It is equally well settled that if all of the tools furnished by the master for use by his servants are defective, then the master can be held liable. Probst v. Heisinger

Motor Co., supra; Pelster v. Shamrod Boiler Co., Mo.App., 268 S.W. 890. Although there was an abundance of testimony that there were no defective claw bars available for use by employees of defendant, including plaintiff, it remains that according to plaintiff's positive testimony all of the bars provided by defendant during the summer of 1952, including the date of the litigated incident, were in a defective condition in that they were chipped and worn in the "V" part of the bar.

Defendant frankly concedes that plaintiff "testified to facts which, if accepted, would make a prima facie case against defendant". But, says defendant, the testimony has no probative value "for the reasons that it is obviously perjurious, entirely beyond reason, and manifestly false". We have carefully examined the testimony of plaintiff and note that in some respects, material to the issue of liability, it was in conflict with a prior statement made by plaintiff to defendant's claim representative and with a deposition given by plaintiff. Likewise careful consideration was accorded the testimony of the numerous witnesses offered by defendant who contradicted what plaintiff had to say respecting the condition and fitness of the claw bar. While it is apparent that the testimony of plaintiff and his witness Jones was discredited, and when considered in the light of the whole record was such as to render it vulnerable to attack, we are unable to find and hold that plaintiff's testimony was opposed to the physics of the case, self-destructive, entirely beyond reason, or so uncertain and contradictory as to deprive it of probative value as was the situation in East v. McMenamy, Mo. Sup., 266 S.W.2d 728, loc. cit. 731 and Lohmann v. Wabash R. Co., Mo.Sup., 269 S.W.2d 885, loc. cit. 891.

The record presents a situation similar to that in Huffman v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 281 S.W.2d 863, 867, wherein this defendant made a like assault upon plaintiff's testimony and urged that it was "so manifestly false, so 'entirely beyond reason' and unbeliev-

able that it was wholly insufficient in probative value to make out a prima facie case." In ruling the point against the defendant, the court said, loc. cit. 868, "We do not say that impeaching evidence was not so sufficiently developed that the jury would not have been justified in disbelieving plaintiff; but we must say it is settled in our practice that it is the province of the jury as the triers of the facts to weigh the evidence and pass upon the credibility of the witnesses and the value of their testimony. Caswell v. St. Louis Public Service Co., Mo.Sup., 262 S.W.2d 40; Higgins v. Terminal R. R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380; Reeves v. Thompson, 357 Mo. 847, 211 S.W.2d 23; Young v. Wheelock, 333 Mo. 992, 64 S.W. 2d 950; Henwood v. Coburn, 8 Cir., 165 F.2d 418."

Upon careful consideration of the record, and following the principle firmly established in this state as reiterated in the Huffman case, supra, the trial court properly submitted the cause to the jury.

Turning to plaintiff's assignment, it should be noted that the trial court did not sustain the motion for a new trial because the verdict was excessive. Rather it was sustained on the ground that the verdict was so excessive as to indicate that bias and prejudice were present and influenced the jury's action. In Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W.2d 333, loc. cit. 340, 8 A.L.R.2d 710, the Supreme Court, in reannouncing there is a distinction to be made, said:

"It is clear there is a vital distinction between mere excessiveness (or inadequacy) of an award, and such excessiveness (or inadequacy) as would indicate a verdict was the result of bias and prejudice; the former may be but an honest mistake of the jury, while the latter savors of misbehavior on the part of the jury. A fair, dispassionate and impartial consideration of the evidence by a jury is vital to a verdict's incipient validity. Stokes v. Wabash R. Co., 355 Mo. 602, 197 S.W.2d 304; Jones v. Pennsylvania R. Co., supra, 353 Mo. [163] at page 172, 182 S.W.2d [157] at page 159, and cases there cited."

With bias and prejudice producing the excessive verdict, remittitur may not be ordered, and the only remedy is a new trial. Dye v. St. Louis-San Francisco Ry. Co., Mo.Sup., 234 S.W.2d 532, loc. cit. 534; Day v. Union Pacific R. Co., Mo. Sup., 276 S.W.2d 212, loc. cit. 216. Of equal importance in resolving the point is the firmly established rule that a court, in granting a new trial on the ground assigned in this case, exercises judicial discretion, and an appellate court has no right to interfere with such action unless it can be said there was a clear abuse of such discretion. Dodd v. Missouri-Kansas-Texas R. Co., 354 Mo. 1205, 193 S.W. 2d 905, loc. cit. 907; Bailey v. Interstate Airmotive, supra; Dye v. St. Louis-San Francisco Ry. Co., supra. And trial judges are encouraged to assume the function of exercising their discretion on questions of the nature we are here considering: Dye v. St. Louis-San Francisco Ry. Co., 234 S.W.2d 532, loc. cit. 533, 534.

We shall summarize the evidence in the light most favorable to sustention of the trial court's ruling, Day v. Union Pacific R. Co., Mo.Sup., 276 S.W.2d 212, loc. cit. 217.

Dr. Daniel Elliott O'Reilly, an orthopedic surgeon, was the only medical witness. He was not the treating physician, but examined plaintiff on October 14, 1954, which was shortly before the trial. The X-rays taken by the doctor revealed some abnormalities of the proximal end of the first bone at the base of the thumb. X-rays taken at the Missouri Pacific Hospital and examined by the doctor while he was testifying revealed a fracture of the proximal end of the first metacarpal. The doctor stated that the thumb appeared to be normal in all the motions except that there was a 30% limitation of ability to bring it away from the hand. He found plaintiff had full motion of the

wrist and all the fingers; that although plaintiff had a permanent disability, he was, in the doctor's opinion, able to perform hard work, depending "on the type of hard work".

Plaintiff was earning, according to his testimony, "about $250 a month" when injured. He lost two month's employment on account of the injury, after which he again worked about a month and a half for defendant. Then he accepted employment by the City as a street and sewer cleaner, and was paid "about" $200 per month for his services as such.

After carefully considering the evidence bearing upon the injury, we are unable to say that the trial court should be convicted of abuse of discretion in granting a new trial upon the ground that the verdict was so excessive as to demonstrate bias and prejudice on the part of the jury. While it stands undisputed that plaintiff suffered a fracture of the proximal end of the first bone in the thumb on his right hand, and that some permanent disability will exist in the movement outward of the thumb, the evidence of plaintiff's examining doctor demonstrates with equal force that plaintiff is not disabled from doing certain types of hard work. Although he sustained a loss of earnings in the amount of $500, the evidence is insufficient to justify a finding that the reduction in his earnings was a consequence of the thumb injury. This is true because the record fails to establish that he left his employment with the defendant because of his inability to do the work he was called upon to perform.

We must bear in mind that the trial judge participated in the proceedings and was cognizant of what transpired in the trial. The cold record before us cannot reveal what the judge actually witnessed. It has been said that, in view of the trial court's opportunity to measure the general effect of the trial proceedings on the jury, the trial court may infer bias and prejudice from the size of the verdict alone. Bailey v. Interstate Airmotive, 219 S.W.2d 333, loc. cit. 340, and cases cited.

Plaintiff failed to discharge the burden imposed upon him to show the court abused its discretion, Dye v. St. Louis-San Francisco Ry. Co., supra; 5 C.J.S., Appeal and Error, § 1584, p. 476, and we therefore affirm the order sustaining motion for new trial.

ANDERSON, P. J., and NOAH WEINSTEIN, Special Judge, concur.